UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STARTNET BUSINESS SOLUTIONS, INC.<br>Plaintiff,<br><br>v.<br><br>CANON USA, INC., CANON BUSINESS SOLUTIONS, INC., CANON SOLUTIONS, AMERICA, INC. AND CANON FINANCIAL SERVICES, INC., TOYOTSUGU KUWAMURA, PETER KOWALCZUK, ARTHUR McGINN, CHARLES BRUSCHI, ELAINE LOUISE DeANGELO, BRIAN SAMUEL WALKER, ROBERT LINDSEY, "JOHN DOE #1", "JOHN DOE #2", "JOHN DOE #3" AND "JOHN DOE #4"<br><br>Defendants. | **CV 18- 2158**<br>_____ CIV 2018<br><br>**VERIFIED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>GARAUFIS, J.<br><br>**SCANLON, M.J.** |

Plaintiff STARTNET BUSINESS SOLUTIONS, INC. ("Starnet"), by and through its attorneys, Schrier Shayne Koenig Samberg & Ryne, P.C., as for its Verified Complaint against CANON USA, INC., CANON BUSINESS SOLUTIONS, INC., CANON SOLUTIONS AMERICA, INC., CANON FINANCIAL SERVICES, INC., PETER KOWALCZUK, ARTHUR McGINN, CHARLES BRUSCHI, ELAINE LOUISE DeANGELO, BRIAN SAMUEL WALKER and ROBERT LINDSEY, (collectively, the "Defendants") respectfully allege the following upon information and belief at all times hereinafter mentioned:

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 11 2018 ★

BROOKLYN OFFICE

## THE PARTIES

1. Plaintiff, Starnet Business Solutions Inc. (hereinafter "Starnet") maintains its principal place of business at 46 Industrial Ave., Mahwah, New Jersey 07430.

2. Defendant, Canon USA, Inc. (hereinafter "Canon USA") is a New York corporation with corporate offices located at One Cannon Park, Melville, New York 11747.

3. Defendant, Canon Business Solutions, Inc. (hereinafter "CBS"), is a New York corporation with offices located at One Canon Park, Melville, New York 11747.

4. Defendant, Canon Solutions America, Inc. (hereinafter "CSA") is it New York Corporation with offices located at One Canon Park, Melville, New York 11747.

5. Defendant "CSA" is the successor business entity to "CBS".

6. Defendant, CSA was formed as a result of a merger of CBS and Oce Display Graphics Systems, Inc.

7. Defendant, Cannon Financial Services, Inc. (hereinafter "CFS") maintained and still maintains its principal place of business at 14904 Collections Center Drive, Chicago, IL 60693.

8. Canon USA is the parent corporation of CSA.

9. Canon USA is the parent corporation of CFS.

10. Toyotsugu Kuwamura (hereinafter "Kuwamura") was and still is the Chairman and Chief Executive Officer of Canon USA.

11. Kuwamura was and still is the Chairman and Chief Executive Officer of CSA.

12. Kuwamura was and still is the Chairman and Chief Executive Officer of CFS.

13. Kuwamura was and still is the Chairman and Chief Executive Officer of CBS.

14. Kuwamura maintains an office at One Canon Park, Melville, New York 11747.

15. Peter Kowalczuk (hereinafter "Kowalczuk") was and still is the President of Canon USA.

16. Kowalczuk was and still is the President of CSA.

17. Kowalczuk was and still is the President of CFS.

18. Kowalczuk was and still is the President of CBS.

19. Kowalczuk maintains an office at One Canon Park, Melville, New York 11747.

20. Arthur McGinn (hereinafter "McGinn") was and still is the Executive Vice President in charge of field service of Canon USA.

21. McGinn was and still is the Executive Vice President in charge of field service of CSA.

22. McGinn was and still is the Executive Vice President in charge of field service of CFS.

23. McGinn was and still is the Executive Vice President in charge of field service of CBS.

24. McGinn maintains an office at One Canon Park, Melville, New York 11747.

25. Charles Bruschi (hereinafter "Bruschi") was and still is the Executive Vice President in charge of finance, accounting and budget of Canon USA.

26. Bruschi was and still is the Executive Vice President in charge of finance, accounting and budget of CSA.

27. Bruschi was and still is the Executive Vice President in charge of finance, accounting and budget of CFS.

28. Bruschi was and still is the Executive Vice President in charge of finance,

accounting and budget of CBS.

29. Bruschi maintains an office at One Canon Park, Melville, New York 11747.

30. Elaine Louise DeAngelo (hereinafter "DeAngelo") was and still is an employee of Canon USA.

31. DeAngelo was and still is an employee of CSA.

32. DeAngelo was and still is an employee of CFS.

33. DeAngelo was and still is an employee of CBS.

34. Brian Samuel Walker (hereinafter "Walker") was and still is an employee of Canon USA.

35. Walker was and still is an employee of CSA.

36. Walker was and still is an employee of CFS.

37. Walker was and still is an employee of CBS.

38. Robert Lindsey (hereinafter "Lindsey") was and still is an employee of Canon USA.

39. Lindsey was and still is an employee of CSA.

40. Lindsey was and still is an employee of CFS.

41. Lindsey was and still is an employee of CBS.

42. John Doe #1, John Doe #2, John Doe #3 and John Doe #4 are to date unknown employees of Canon USA and/or CBS and/or CSA and/or CFS who participated in and/or who performed wrongful conduct and actions and/or inactions as more fully set forth herein below.

## JURISDICTION AND VENUE

43. This court has jurisdiction over the issues raised in this complaint pursuant to 28

USC §1332 in that the matter in controversy exceeds $75,000 and the defendants

maintain a principal place of business in a state other than the state in which the Plaintiff

maintains its principal place of business.

44. This court has jurisdiction over the issues raised in this complaint pursuant to 18

USC §1964(c) in that this is an action brought pursuant to 18 USC §§ 1961-1968.

45. The venue is properly found in this court pursuant to 28 USC §1391(b) and (c).

46. The venue is properly found in this court pursuant to 18 USC §1965

## 1.  FACTS APPLICABLE TO ALL CLAIMS

47. Starnet was and still is in the business of commercial printing.

48. Starnet owns and or leases multiple presses in connection with the operation of its

commercial business.

49. Among the presses owned and/or leased by Starnet in connection with the

operation of its business, Starnet relies upon commercial digital color presses to service

customers who require same day or next day service for multi-color commercial printing

jobs.

50. Same day or next day multi-color printing jobs represents a significant portion of

Starnet's business.

51. Same day or next day multi-color printing jobs represents a significant portion of

Starnet's annual revenue.

52. Canon USA is in the business of sales of various electronic equipment including

but not limited to a model IPC700 Digital color press.

53. Canon USA is in the business of servicing various electronic equipment including

but not limited to a model IPC700 digital color press.

54. Canon USA is in the business of financing various electronic equipment including but not limited to model IPC700 digital color press.

55. Canon USA is in the business of leasing various electronic equipment including but not limited to model IPC700 digital color press.

56. CBS is in the business of sales of various electronic equipment including but not limited to a model IPC700 Digital color press.

57. CBS is in the business of servicing various electronic equipment including but not limited to a model IPC700 digital color press.

58. CBS is in the business of financing various electronic equipment including but not limited to model IPC700 digital color press.

59. CBS is in the business of leasing various electronic equipment including but not limited to model IPC700 digital color press.

60. CSA is in the business of sales of various electronic equipment including but not limited to a model IPC700 Digital color press.

61. CSA is in the business of servicing various electronic equipment including but not limited to a model IPC700 digital color press.

62. CSA is in the business of financing various electronic equipment including but not limited to model IPC700 digital color press.

63. CSA is in the business of leasing various electronic equipment including but not limited to model IPC700 digital color press.

64. CFS is in the business of sales of various electronic equipment including but not limited to a model IPC700 Digital color press.

65. CFS is in the business of servicing various electronic equipment including but not

limited to a model IPC700 digital color press.

66. CFS is in the business of financing various electronic equipment including but not limited to model IPC700 digital color press.

67. CFS is in the business of leasing various electronic equipment including but not limited to model IPC700 digital color press.

68. Canon USA is an enterprise as defined in 18 USC §1961(4).

69. CBS is an enterprise as defined in 18 USC §1961(4).

70. CSA is an enterprise as defined in 18 USC §1961(4).

71. CFS is an enterprise as defined in 18 USC §1961(4).

72. As the parent corporation of CSA, Canon USA has established various policies of operation with respect to the operations of CSA.

73. As the parent corporation of CFS, Canon USA has established various policies of operation with respect to the operations of CFS.

74. As the parent corporation of CBS, Canon USA has established various policies of operation with respect to the operations of CBS.

75. Kuwamura participated in and directed the establishment of various policies with regard to the operations of Canon USA.

76. Kuwamura participated in and directed the establishment of various policies with regard to the operations of CBS.

77. Kuwamura participated in and directed the establishment of various policies with regard to the operations of CSA.

78. Kuwamura participated in and directed the establishment of various policies with regard to the operations of CFS.

79. Kowalczuk participated in and directed the establishment of various policies with regard to the operations of Canon USA.

80. Kowalczuk participated in and directed the establishment of various policies with regard to the operations of CBS.

81. Kowalczuk participated in and directed the establishment of various policies with regard to the operations of CSA.

82. Kowalczuk participated in and directed the establishment of various policies with regard to the operations of CFS.

83. McGinn participated in and directed the establishment of various policies with regard to the operations of Canon USA.

84. McGinn participated in and directed the establishment of various policies with regard to the operations of CBS.

85. McGinn participated in and directed the establishment of various policies with regard to the operations of CSA.

86. McGinn participated in and directed the establishment of various policies with regard to the operations of CFS.

87. Bruschi participated in and directed the establishment of various policies with regard to the operations of Canon USA.

88. Bruschi participated in and directed the establishment of various policies with regard to the operations of CBS.

89. Bruschi participated in and directed the establishment of various policies with regard to the operations of CSA.

90. Bruschi participated in and directed the establishment of various policies with

regard to the operations of CFS.

91. Lindsey participated in and directed the establishment of various policies with regard to the operations of Canon USA.

92. Lindsey participated in and directed the establishment of various policies with regard to the operations of CBS.

93. Lindsey participated in and directed the establishment of various policies with regard to the operations of CSA.

94. Lindsey participated in and directed the establishment of various policies with regard to the operations of CFS.

95. On or about October 24, 2014 Walker was employed by CSA.

96. On or about October 24, 2014 Lindsay was employed by CSA.

97. On or about October 24, 2014 Walker was employed as a sales person by CSA.

98. On or about October 24, 2014 Lindsay was Walker's supervisor.

99. On or about October 24, 2014 Walker, under Lindsey's supervision, caused CSA to enter into lease agreement # ULF-S0344280.12 with Starnet for three (3) IPC700 Canon digital color presses (hereinafter "the lease agreement").

100.    The IPC 700 Canon Digital color press is a high-speed high-quality commercial digital press.

101.    Immediately upon the execution of the lease agreement, CSA assigned all its rights, but not its obligations in the lease agreement to CFS.

102.    Pursuant to the lease agreement maintenance was not included with respect to the three (3) IPC 700 Canon Digital color presses (hereinafter "the equipment") being leased by Starnet.

103.    On or about October 24, 2014 Starnet entered into a separate maintenance agreement (hereinafter "the maintenance agreement") with CSA with respect to the equipment.

104.    Pursuant to the maintenance agreement, CSA agreed to provide routine preventative maintenance on the equipment.

105.    Pursuant to the maintenance agreement, CSA agreed to provide emergency service on the equipment on an as needed basis.

106.    Pursuant to the maintenance agreement, CSA agreed to keep the equipment in good working order.

107.    Pursuant to the maintenance agreement the equipment would be networked with CSA's so-called "imageWare", which permitted CSA to monitor the equipment.

108.    The imageWare network protocol permitted CSA to remotely update software of the equipment, transmit use data of the equipment, transmit service data of the equipment and store, analyze and utilize such data to service the equipment.

109.    The imageWare protocol was designed to enable CSA to have advanced notice of wear and tear on equipment parts that required periodic replacement on a preventative basis in order to keep the equipment operational without repeated breakdowns.

110.    The imageWare protocol was designed to enable CSA to have advanced notice of wear and tear on equipment parts that required periodic replacement on a preventative basis in order to reduce and eliminate the need for "emergency" service calls to repair the equipment and keep it operational without repeated breakdowns.

111.    To induce Starnet into entering into the lease agreement, Walker represented to Plaintiff that CSA, as part of the separate maintenance agreement, would remotely monitor the equipment and routinely and regularly perform preventative maintenance on the equipment, which included replacement of various parts of the equipment such as drums, belts, etc.

112.    To induce Starnet into entering into the lease agreement, Lindsey represented to Plaintiff that CSA, as part of the separate maintenance agreement, would remotely monitor the equipment and routinely and regularly perform preventative maintenance on the equipment, which included replacement of various parts of the equipment such as drums, belts, etc.

113.    To induce Starnet into entering into the lease agreement, Walker represented to Plaintiff that CSA, as part of the separate maintenance agreement would replace all consumables (excluding paper and staples) in connection with the use and operation of the equipment "preventively" to avoid repeated breakdown of the equipment.

114.    To induce Starnet into entering into the lease agreement, Lindsey represented to Plaintiff that CSA, as part of the separate maintenance agreement would replace all consumables (excluding paper and staples) in connection with the use and operation of the equipment "preventively" to avoid repeated breakdown of the equipment.

115.    The representation made by Defendants that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

116.    The representation made by defendants that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

117.    Defendant, Canon USA knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

118.    Defendant, CBS knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

119.    Defendant, CSA knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

120.    Defendant, CFS knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

121.    Defendant, Kuwamura knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

122.    Defendant, Kowalczuk knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

123.    Defendant, McGinn knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

124.    Defendant, Bruschi knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

125.    Defendant, Lindsey knew that the representations that CSA would

routinely and regularly perform preventative maintenance on the equipment was false when made.

126.    Defendant, Walker knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

127.    Defendant, Canon USA knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

128.    Defendant, CBS knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

129.    Defendant, CSA knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

130.    Defendant, CFS knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

131.    Defendant, Kuwamura knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

132.    Defendant, Kowalczuk knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

133.    Defendant, McGinn knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

134.    Defendant, Bruschi knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

135.    Defendant, Walker knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

136.    Defendant, Lindsey knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

137.    Starnet relied upon the foregoing representations made by Defendants in connection with its decision to enter into the lease agreement for the equipment.

138.    Defendants knew that Starnet was relying upon the foregoing representations in connection with Starnet's decision to enter into the lease agreement.

139.    From October 24, 2014 to the present CSA failed to perform preventive maintenance on the equipment as provided for in the maintenance agreement.

140.    By reason of CSA's failure to perform preventative maintenance as required by the maintenance agreement, the equipment repeatedly ceased operating which required repeated maintenance calls.

141.    Notwithstanding promises to the contrary, CSA rarely if ever provided

same day or next day service calls whenever the equipment broke down and became inoperable.

142.     By reason of the foregoing, Plaintiff repeatedly missed deadlines to produce products ordered by its customers.

143.     By reason of the foregoing, Plaintiff lost significant business.

144.     By reason of the foregoing, Plaintiff lost significant revenue.

145.     By reason of the foregoing, Plaintiff lost customers.

146.     With regard to servicing Canon products, including but not limited to the IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" on equipment subject to a maintenance agreement, it was the policy of Defendants to provide only the maintenance and the repair of Canon products when customers requested service.

147.     With regard to servicing Canon products, including but not limited to the IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" on equipment subject to a maintenance agreement, it was the policy of Defendants to provide only limited preventative maintenance.

148.     IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" on equipment subject to a maintenance agreement, it was the policy of Defendants to provide only the maintenance and the repair of Canon products when customers requested service for the purposes of reducing the overall cost of providing maintenance services.

149.     The result of the foregoing policy was that Canon products, including but

not limited to the IPC 700 Canon digital color presses broke down on a periodic basis resulting in significant downtime.

150.     The result of the foregoing policy was that consumers of Canon products, including but not limited to the IPC 700 Canon digital color presses lost revenue and in some cases lost customers because they were unable to deliver products in the time period expected.

151.     The result of the foregoing policy was that Plaintiff, as a consumer of Canon products, and more particularly a consumer of the IPC 700 Canon digital color presses was caused to lose business, lose revenue and lose customers because of the repeated breakdown of the equipment that was subject to the maintenance agreement.

152.     With regard to servicing Canon products, including but not limited to the IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" and emergency service to keep the equipment in good working order by CSA, it was CSA's policy to withhold any service on any equipment subject to a maintenance agreement, if the customer was delinquent in any obligation to CFS.

153.     With regard to servicing Canon products, including but not limited to the IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" and emergency service to keep the equipment in good working order by CSA, it was Canon USA's policy to require CSA to withhold any service on any equipment subject to a maintenance agreement with CSA, if the customer was delinquent in any obligation to CFS.

154.     With regard to servicing Canon products, including but not limited to the

IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" and emergency service to keep the equipment in good working order by CSA, it was CFS's policy to notify CSA of said delinquency and induce and direct CSA to withhold any service on any equipment subject to a maintenance agreement, if the customer was delinquent in any obligation to CFS.

155.    With regard to servicing Canon products, including but not limited to the IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" and emergency service to keep the equipment in good working order by CSA, it was CSA's policy to withhold any service on any equipment subject to a maintenance agreement, if the customer was delinquent in any obligation to CFS.

156.    With regard to servicing the equipment, notwithstanding the written obligation to Plaintiff to provide "routine preventative maintenance" and emergency service to keep the equipment in good working order by CSA, it was CSA's policy to withheld service on the equipment that was the subject to the maintenance agreement, because of a delinquency in payments owed to CFS pursuant to the lease agreement for the equipment.

157.    With regard to the foregoing policy, DeAngelo was aware of the policy to cause CSA to withhold maintenance to a customer that was delinquent in payments to CFS.

158.    With regard to the foregoing policy, DeAngelo was charged by CFS to implement the foregoing policy to cause CSA to withhold maintenance to a customer that was delinquent in payments to CFS.

159.    With regard to the foregoing policy, DeAngelo was charged with the responsibility of causing CSA to withhold maintenance to Plaintiff by reason of Plaintiff's delinquency in payments to CFS.

160.    DeAngelo did in fact, on behalf of CFS, in following the foregoing policy, cause or contribute to CSA's refusal to maintain the equipment that was leased to Plaintiff.

161.    The result of the foregoing policy was that Canon products, including but not limited to the IPC 700 Canon digital color presses broke down on a periodic basis resulting in significant downtime.

162.    The result of the foregoing policy was that consumers of Canon products, including but not limited to the IPC 700 Canon digital color presses lost revenue and in some cases lost customers because they were unable to deliver products in the time period expected.

163.    The result of the foregoing policy was that Plaintiff, as a consumer of Canon products, and more particularly a consumer of the IPC 700 Canon digital color presses was caused to lose business, lose revenue and lose customers because of the repeated breakdown of the equipment that was subject to the maintenance agreement.

164.    The foregoing policies of Defendants was ongoing, repetitive and is expected to continue indefinitely into the future.

165.    The foregoing policy was part and parcel of fraudulent conduct by Defendants to induce consumers and more particularly the Plaintiff to purchase and/or lease Canon products and in Plaintiff's case lease the three (3) IPC 700 Canon digital color presses.

166.     The sale and/or leasing of Canon products and more particularly the IPC 700 Canon digital color press was a consumer oriented transaction as defined in New York General Business Law Section 349.

167.     The lease of the three (3) IPC 700 Canon digital color presses to Plaintiff was a consumer oriented transaction as defined in New York General Business Law Section 349.

168.     The maintenance agreement entered into between Plaintiff and CSA was a consumer oriented transaction as defined in New York General Business Law Section 349.

169.     As set forth above, the representations made to consumers in general and to Plaintiff specifically was material and misleading as those terms are defined in New York General Business Law Section 349.

170.     More specifically, the representation made to Plaintiff that CSA would provide routine preventative maintenance for the equipment being leased by Plaintiff was a material term of the maintenance agreement as that term is defined in New York General Business Law Section 349.

171.     More specifically, the representation made to Plaintiff that CSA would provide emergency service to keep the equipment in good working order was a material term of the maintenance agreement as that term is defined in New York General Business Law Section 349.

172.     More specifically, the representation made to Plaintiff that CSA would provide routine preventative maintenance for the equipment being leased by Plaintiff was misleading as term is defined in New York General Business Law Section 349.

173.     More specifically, the representation made to Plaintiff that CSA would provide emergency service to keep the equipment in good working order was misleading as that term is defined in New York General Business Law Section 349.

174.     The representation made to Plaintiff that CSA would provide routine preventative maintenance for the equipment being leased by Plaintiff was a material term of the maintenance agreement.

## FIRST CAUSE OF ACTION
### (Deceptive Practice pursuant to General Business Law §349)
### (Against All Defendants)

175.     Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through 174 as though fully set forth herein.

176.     As set forth more fully hereinabove, the lease of the equipment was a consumer oriented transaction, as that term is defined in New York General Business Law Section 349.

177.     As set forth more fully hereinabove, the maintenance agreement with respect to the maintenance of the equipment was a consumer oriented transaction, as that term is defined in New York General Business Law Section 349.

178.     As set forth hereinabove the actions of Defendants were both misleading and material, as those terms are defined in New York General Business Law Section 349.

179.     As set forth above, by reason of Defendants misleading and material representations made to Plaintiffs and the Defendants' failure to maintain the equipment as represented and as set forth in the maintenance agreement, Plaintiff was injured.

180.     By reason of the foregoing, Plaintiff was injured in the sum in $2,000,000.

181.     By reason of the foregoing and pursuant to New York General Business Law Section 349 Plaintiff demands treble damages from Defendants.

182.     By reason of the foregoing and pursuant to New York General Business Law Section 349 Plaintiff demands legal fees from Defendants as well as the costs and disbursements of this action in an amount to be determined by the trier of fact.

**SECOND CAUSE OF ACTION**
**(BREACH OF CONTRACT)**
**(Against Defendant CANON SOLUTIONS AMERICA, INC.**
**AND CANON BUSINESS SOLUTIONS, INC.)**

183.     Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "182" as though fully set forth herein.

184.     On or about October 24, 2014 Starnet entered into a maintenance agreement with CSA with respect to the equipment.

185.     Pursuant to the maintenance agreement, CSA agreed to provide routine preventative maintenance on the equipment.

186.     Pursuant to the maintenance agreement, CSA agreed to provide emergency service on the equipment on an as needed basis.

187.     Pursuant to the maintenance agreement, CSA agreed to keep the equipment in good working order.

188.     Pursuant to the maintenance agreement the equipment would be networked with CSA's so-called "imageWare", which permitted CSA to monitor the equipment.

189.     The imageWare network protocol permitted CSA to remotely update

software of the equipment, transmit use data of the equipment, transmit service data of the equipment and store, analyze and utilize such data to service the equipment.

190.     The imageWare protocol was designed to enable CSA to have advanced notice of wear and tear on equipment parts that required periodic replacement on a preventative basis in order to keep the equipment operational without repeated breakdowns.

191.     The imageWare protocol was designed to enable CSA to have advanced notice of wear and tear on equipment parts that required periodic replacement on a preventative basis in order to reduce and eliminate the need for "emergency" service calls to repair the equipment and keep it operational without repeated breakdowns.

192.     As part of the separate maintenance agreement, Defendants agreed to remotely monitor the equipment and routinely and regularly perform preventative maintenance on the equipment, which included replacement of various parts of the equipment such as drums, belts, etc.

193.     Defendants CSA and CBS breached the maintenance agreement, in that CSA and CBS failed to provide the agreed routine preventative maintenance on the equipment.

194.     Defendants CSA and CBS breached the maintenance agreement, in that CSA and CBS failed to provide the agreed to emergency service on the equipment on an as needed basis.

195.     Defendants CSA and CBS breached the maintenance agreement, in that CSA and CBS failed to network the equipment utilizing CSA's so-called "imageWare",

196.     Defendants CSA and CBS breached the maintenance agreement, in that

CSA and CBS failed to monitor the equipment utilizing CSA's so-called "imageWare",

197.   By reason of CSA's failure to perform preventative maintenance as required by the maintenance agreement, the equipment repeatedly ceased operating which required repeated maintenance calls.

198.   Notwithstanding promises to the contrary, CSA rarely if ever provided same day or next day service calls whenever the equipment broke down and became inoperable.

199.   By reason of the foregoing, Plaintiff repeatedly missed deadlines to produce products ordered by its customers.

200.   By reason of the foregoing, Plaintiff lost significant business.

201.   By reason of the foregoing, Plaintiff lost significant revenue.

202.   By reason of the foregoing, Plaintiff lost customers.

203.   By reason of the foregoing Plaintiff has been damaged in the sum of $2,000,000

## THIRD CAUSE OF ACTION
### (FRAUD and MISREPRESENTATION)
### (Against Defendants CANON USA, CSA, CBS, CFS, KUWAMURA, KOWALCZUK, McGINN, BRUSCHI, WALKER and LINDSEY)

204.   Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "203" as though fully set forth herein.

205.   To induce Starnet into entering into the lease agreement, Walker represented to Plaintiff that CSA, as part of the separate maintenance agreement, would remotely monitor the equipment and routinely and regularly perform preventative

maintenance on the equipment, which included replacement of various parts of the equipment such as drums, belts, etc.

206.    To induce Starnet into entering into the lease agreement, Lindsey represented to Plaintiff that CSA, as part of the separate maintenance agreement, would remotely monitor the equipment and routinely and regularly perform preventative maintenance on the equipment, which included replacement of various parts of the equipment such as drums, belts, etc.

207.    To induce Starnet into entering into the lease agreement, Walker represented to Plaintiff that CSA, as part of the separate maintenance agreement would replace all consumables (excluding paper and staples) in connection with the use and operation of the equipment "preventively" to avoid repeated breakdown of the equipment.

208.    To induce Starnet into entering into the lease agreement, Lindsey represented to Plaintiff that CSA, as part of the separate maintenance agreement would replace all consumables (excluding paper and staples) in connection with the use and operation of the equipment "preventively" to avoid repeated breakdown of the equipment.

209.    The representation made by Defendants that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

210.    The representation made by defendants that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

211.    Defendant, Canon USA knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

212.     Defendant, CBS knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

213.     Defendant, CSA knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

214.     Defendant, CFS knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

215.     Defendant, Kuwamura knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

216.     Defendant, Kowalczuk knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

217.     Defendant, McGinn knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

218.     Defendant, Bruschi knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

219.     Defendant, Lindsey knew that the representations that CSA would routinely and regularly perform preventative maintenance on the equipment was false when made.

220.     Defendant, Walker knew that the representations that CSA would

routinely and regularly perform preventative maintenance on the equipment was false when made.

221.    Defendant, Canon USA knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

222.    Defendant, CBS knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

223.    Defendant, CSA knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

224.    Defendant, CFS knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

225.    Defendant, Kuwamura knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

226.    Defendant, Kowalczuk knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

227.    Defendant, McGinn knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

228.    Defendant, Bruschi knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

229.    Defendant, Walker knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

230.    Defendant, Lindsey knew that the representations that CSA would replace all consumables in connection with the use and operation of the equipment "preventively" was false when made.

231.    Starnet relied upon the foregoing representations made by Defendants in connection with its decision to enter into the lease agreement for the equipment.

232.    Defendants knew that Starnet was relying upon the foregoing representations in connection with Starnet's decision to enter into the lease agreement.

233.    From October 24, 2014 to the present CSA failed to perform preventive maintenance on the equipment as provided for in the maintenance agreement.

234.    By reason of CSA's failure to perform preventative maintenance as required by the maintenance agreement, the equipment repeatedly ceased operating which required repeated maintenance calls.

235.    Notwithstanding promises to the contrary, CSA rarely if ever provided same day or next day service calls whenever the equipment broke down and became inoperable.

236.    By reason of the Defendants fraud and misrepresentations, Plaintiff repeatedly missed deadlines to produce products ordered by its customers.

237.    By reason of the Defendants fraud and misrepresentations, Plaintiff lost significant business.

238.    By reason of the Defendants fraud and misrepresentations, Plaintiff lost significant revenue.

239.    By reason of the Defendants fraud and misrepresentations, Plaintiff lost customers.

240.    By reason of the Defendants fraud and misrepresentations, Plaintiff was damaged in the sum of $2,000,000.

### FOURTH CAUSE OF ACTION
### (ACTION PURSUANT TO 18 USC §§ 1961-1968 {RICO CLAIM})
### (Against Defendants CANON USA, CSA, CBS, CFS, KUWAMURA, KOWALCZUK, McGINN, BRUSCHI, DeANGELO WALKER and LINDSEY)

241.    Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "240" as though fully set forth herein.

242.    The Defendant corporations are enterprises as defined in the RICO statutes.

243.    The Defendants are engaged in interstate commerce as set forth more fully hereinabove.

244.    Each of the individual named Defendants are employees of one (1) or more of the named corporate Defendants.

245.    Each of the individual named Defendants, acted in their respective capacity as an employee and/or officer of one or more of the named corporate Defendants.

246.    Each of the individual named Defendants participated in the wrongful conduct on behalf of his or her employer as more fully set forth hereinabove.

247.    The Racketeering conduct alleged herein is the fraudulent conduct set forth hereinabove.

248.    The pattern of racketeering activity alleged hereinabove includes but is not limited to the ongoing fraudulent policies of the corporate Defendants, as set forth above and the implementation of those ongoing policies by the individually named Defendants.

249.    Further, the pattern of racketeering activity includes the fraudulent policies and conduct of the Defendants which are ongoing against numerous members of the consuming public including the Plaintiff as set forth in greater detail hereinabove.

250.    The result of the foregoing fraudulent policies, as set forth hereinabove was that Canon products, including but not limited to the IPC 700 Canon digital color presses broke down on a periodic basis resulting in significant downtime.

251.    The result of the foregoing fraudulent policies, as set forth above was that consumers of Canon products, including but not limited to the IPC 700 Canon digital color presses lost revenue and in some cases lost customers because they were unable to deliver products in the time period expected.

252.    The result of the foregoing policies, as set forth above was that Plaintiff, as a consumer of Canon products, and more particularly a consumer of the IPC 700 Canon digital color presses was caused to lose business, lose revenue and lose customers because of the repeated breakdown of the equipment that was subject to the maintenance agreement.

253.    The foregoing policies of Defendants was ongoing, repetitive and is

expected to continue indefinitely into the future.

254.      The foregoing policy was part and parcel of fraudulent conduct by Defendants to induce consumers and more particularly the Plaintiff to purchase and/or lease Canon products and in Plaintiff's case lease the three (3) IPC 700 Canon digital color presses.

255.      The damages as set forth herein were proximately caused by the violations of the RICO statutes (18 USC §§1961-1968 and more particularly 18 USC § 1965)

256.      By reason of the foregoing, Plaintiff has been damaged in the sum of $2,000,000.

257.      Pursuant to the RICO statutes, Plaintiff hereby demands treble damages plus attorney's fees and the costs of this lawsuit.

**FIFTH CAUSE OF ACTION**
**(INTEFENENCE WITH CONTRACTUAL RELATIONS)**
**(Against Defendants, CANON FINANCIAL SERVICES, INC.,**
**CANON USA, INC., KUWAMURA, BRUSCHI, and DeANGELO)**
)

258.      Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "257" as though fully set forth herein.

259.      On or about October 24, 2014 CSA entered into lease agreement # ULF S0344280.12 with Starnet for three (3) IPC700 Canon digital color presses.

260.      Immediately upon the execution of the lease agreement, CSA assigned all its rights, but not its obligations in the lease agreement to CFS.

261.      Pursuant to the lease agreement maintenance was not included with respect to the three (3) IPC 700 Canon Digital color being leased by Starnet.

262.     On or about October 24, 2014 Starnet entered into a separate maintenance agreement with CSA with respect to the equipment.

263.     Pursuant to the maintenance agreement, CSA agreed to provide routine preventative maintenance on the equipment.

264.     Pursuant to the maintenance agreement, CSA agreed to provide emergency service on the equipment on an as needed basis.

265.     Pursuant to the maintenance agreement, CSA agreed to keep the equipment in good working order.

266.     Pursuant to the maintenance agreement the equipment would be networked with CSA's so-called "imageWare", which permitted CSA to monitor the equipment.

267.     The imageWare network protocol permitted CSA to remotely update software of the equipment, transmit use data of the equipment, transmit service data of the equipment and store, analyze and utilize such data to service the equipment.

268.     The imageWare protocol was designed to enable CSA to have advanced notice of wear and tear on equipment parts that required periodic replacement on a preventative basis in order to keep the equipment operational without repeated breakdowns.

269.     The imageWare protocol was designed to enable CSA to have advanced notice of wear and tear on equipment parts that required periodic replacement on a preventative basis in order to reduce and eliminate the need for "emergency" service calls to repair the equipment and keep it operational without repeated breakdowns.

270.     As part of the maintenance agreement, CSA agreed to remotely monitor

the equipment and routinely and regularly perform preventative maintenance on the equipment, which included replacement of various parts of the equipment such as drums, belts, etc.

271.     As part of the separate maintenance agreement CSA agreed to replace all consumables (excluding paper and staples) in connection with the use and operation of the equipment "preventively" to avoid repeated breakdown of the equipment.

272.     With regard to servicing Canon products, including but not limited to the IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" and emergency service to keep the equipment in good working order by CSA, it was CSA's policy to withhold any service on any equipment subject to a maintenance agreement, if CFS notified CSA that the customer was delinquent in any obligation to CFS.

273.     With regard to servicing Canon products, including but not limited to the IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" and emergency service to keep the equipment in good working order by CSA, it was Canon USA's policy to require CSA to withhold any service on any equipment subject to a maintenance agreement with CSA, if the customer was delinquent in any obligation to CFS.

274.     With regard to servicing Canon products, including but not limited to the IPC 700 Canon digital color press, notwithstanding the written obligation to provide "routine preventative maintenance" and emergency service to keep the equipment in good working order by CSA, it was CFS's policy to notify CSA of said delinquency and

induce and direct CSA to withhold any service on any equipment subject to a maintenance agreement, if the customer was delinquent in any obligation to CFS.

275.     With regard to the foregoing policy, DeAngelo was aware of the policy to cause CSA to withhold maintenance to a customer that was delinquent in payments to CFS.

276.     With regard to the foregoing policy, DeAngelo was charged by CFS to implement the foregoing policy to cause CSA to withhold maintenance to a customer that was delinquent in payments to CFS.

277.     With regard to the foregoing policy, DeAngelo was charged with the responsibility of causing CSA to withhold maintenance to Plaintiff by reason of Plaintiff's delinquency in payments to CFS.

278.     DeAngelo did in fact, on behalf of CFS, in following the foregoing policy, cause or contribute to CSA's refusal to maintain the equipment that was leased to Plaintiff.

279.     Kuwamura, as Chairman and CEO of Canon USA, created the policy in which CFS was required to notify CSA if any customer was delinquent in any obligation to CFS.

280.     Kuwamura, as Chairman and CEO of Canon USA, caused to be implemented the policy requiring CFS to notify CSA if any customer was delinquent in any obligation to CFS.

281.     Bruschi, as Sr. Vice President of Finance, Accounting and Budget of Canon USA, created the policy in which CFS was required to notify CSA if any customer was delinquent in any obligation to CFS.

282.     Bruschi, as Sr. Vice President of Finance, Accounting and Budget of Canon USA, caused to be implemented the policy requiring CFS to notify CSA if any customer was delinquent in any obligation to CFS.

283.     By reason of the foregoing policy and implementation of the policy, Defendants interfered with the contractual relations between Plaintiff and CSA in that CSA refused to service Plaintiff's equipment.

284.     By reason of Defendants' interference with the contractual relations between Plaintiff and CSA, the three (3) IPC 700 Canon digital color presses broke down on a periodic basis resulting in significant downtime.

285.     By reason of Defendants' interference with the contractual relations between Plaintiff and CSA, Plaintiff lost revenue and lost customers because Plaintiff was unable to deliver products in the time period expected.

286.     By reason of Defendants' interference with the contractual relations between Plaintiff and CSA, between the period October 24, 2014 to the January 31, 2018 CSA failed and refused to perform preventive maintenance on the equipment as provided for in the maintenance agreement.

287.     By reason of Defendants' interference with the contractual relations between Plaintiff and CSA, and by reason of CSA's failure to perform preventative maintenance as required by the maintenance agreement, the equipment repeatedly ceased operating which required repeated maintenance calls.

288.     By reason of Defendants' interference with the contractual relations between Plaintiff and CSA, Plaintiff repeatedly missed deadlines to produce products ordered by its customers.

289.     By reason of Defendants' interference with the contractual relations between Plaintiff and CSA, Plaintiff lost significant business.

290.     By reason of Defendants' interference with the contractual relations between Plaintiff and CSA, Plaintiff lost significant revenue.

291.     By reason of Defendants' interference with the contractual relations between Plaintiff and CSA, Plaintiff lost customers.

292.     By reason of the foregoing, Plaintiff has been damaged in the sum of $2,000,000.

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

**FIRST CAUSE OF ACTION**:     for deceptive practices pursuant to General Business Law §349 against all defendants
Two Million Dollars, ($2,000,000.00) together with attorney's fees, costs and interest thereon and treble damages;

**SECOND CAUSE OF ACTION:**     Breach of Contract against CANON SOLUTIONS AMERICA, INC. AND CANON BUSINESS SOLUTIONS, INC.
Two Million Dollars, ($2,000,000.00) together with costs and interest;

**THIRD CAUSE OF ACTION:**     Fraud and Misrepresentation against CANON USA, INC., CANON SOLUTIONS AMERICA, INC., CANON BUSINESS SOLUTIONS, INC., CANON FINANCIAL SYSTEMS, INC., KUWAMURA, KOWALCZUK, McGINN, BRUSCHI, WALKER and LINDSEY
Two Million Dollars, ($2,000,000.00) together with costs and interest and further Plaintiff demands Punitive damages;

**FOURTH CAUSE OF ACTION:**     RICO claim (pursuant to 18 USC 1961-1968) against CANON USA, CANON SYSTEMS AMERICA, INC., CANON BUSINESS SYSTEMS, INC. CANON FINANCIAL SYSTEMS, INC. KUWAMURA, KOWALCZUK,

McGINN, BRUSCHI, DeANGELO WALKER and
LINDSEY
Two Million Dollars, ($2,000,000.00) together with
attorney's fees, costs and interest thereon and treble
damages;

**FIFTH CAUSE OF ACTION**:              Interference with Contractual Relations
against <u>CANON FINANCIAL SERVICES,
INC., CANON USA, INC., KUWAMURA,
BRUSCHI,</u> and DeANGELO
Two    Million    Dollars,    ($2,000,000.00)
together with costs and interest; and

(f)       Such other and further relief as to this Court may deem just and

proper, together with attorney's fees, punitive damages and the costs of this action.

Dated: Garden City, New York
          April 10, 2018
                              SCHRIER SHAYNE KIOENIG SAMBERG & RYNE, PC

                              By: _____
                                    Richard E. Schrier, Esq.
                                    Attorneys for Plaintiffs
                                    595 Stewart Avenue
                                    Garden City, New York 11530
                                    Tel: (516) 739-8000

# ATTORNEY'S VERIFICATION

STATE OF NEW YORK    )
                            ) SS.:
COUNTY OF NASSAU    )

       I, the undersigned, an attorney duly admitted to practice in the Courts of New York State and before the United States District Court for the Eastern District of New York, state that I am the attorney of record for **STARNET BUSINESS SOLUTIONS, INC.**, the **PLAINTIFF** in the within action.

       I have read the foregoing **COMPLAINT** and know the contents thereof; the same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters, I believe it to be true.

       The grounds of my belief as to all matters not stated upon my own knowledge are based on my file, together with the books, records and documents contained therein.

       I affirm that the foregoing statements are true, under the penalties of perjury.

_____

**RICHARD E. SCHRIER, ESQ.**